**SO ORDERED.**

**SIGNED this 05 day of July, 2007.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

**PUBLISHED**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| TROY A. WRIGHT, | ) | Case No. 05-10164 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| J. MICHAEL MORRIS, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary No. 05-5615 |
| | ) | |
| TROY A. WRIGHT; MELISSA L. WRIGHT; | ) | |
| and LINDA S. PARKS, Trustee in Bankruptcy | ) | |
| for Melissa L. Wright, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

The trustee seeks to recover from defendant Troy Wright ("Wright") the estate's share of his

-1-

2004 and 2005 federal and state income tax refunds. The trustee also seeks to revoke defendant's discharge for disobeying two turnover orders and failing to turnover property of the estate. The trustee, J. Michael Morris, ("Morris") appeared on his own behalf. Wright appeared in person and by his bankruptcy attorney, Dennis Shay ("Shay") of Smith, Shay, Farmer & Wetta, LLC.

The Court took this matter under advisement following a trial held on April 24, 2007. The Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52 as made applicable to bankruptcy cases and proceedings by Fed. R. Bankr. P. 7052.

**Jurisdiction**

This proceeding for turnover of income tax refunds and revocation of discharge is a core proceeding under 28 U.S.C. § 157(b)(2)(E) and (J). The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(1) and § 1334(b).

**Findings of Fact**

The facts of this adversary proceeding present the Court with yet another case involving the interplay between bankruptcy and domestic relations law. Wright filed his bankruptcy petition on January 14, 2005. He and his wife, Melissa, filed for divorce in the District Court of Sedgwick County, Kansas on July 8, 2004. The divorce was still open on the petition date. Prior to the petition date, Wright and his wife purportedly agreed that they would file a joint income tax return for 2004 and share equally in any refunds received. It was unclear from the evidence when this oral understanding was reached, but in any event, it was not memorialized at that time. Wright's statement of affairs did not reveal the existence of any pending litigation. His Schedule I described him as "divorced." Nevertheless, the divorce case was not journalized in state court until November

9, 2005.[1] In that journal entry, the domestic court memorialized the parties agreement concerning the tax refunds and divided them equally among Troy and Melissa.[2] Neither party requested relief from the automatic stay before dividing the property and concluding the divorce case.[3]

On January 19, 2005, Morris wrote Wright and Shay requesting a copy of Wright's 2004 tax returns and advising them that any refund received should not be disposed of until the estate's interest could be determined.[4] At Wright's first meeting of creditors, held February 14, he informed Morris that he and Melissa were divorcing, that the litigation was not yet concluded, and that his and Melissa's tax return "won't be joint." He did agree to supply Morris with whatever return he might file. On April 25, Shay wrote Morris transmitting a copy of Wright's 2004 return. This is when Morris first learned that Wright had filed a joint tax return for 2004 with Melissa.

On May 16, Morris wrote Wright and Shay and made demand for turnover of $6,691 of the 2004 refunds.[5] This amount was based upon Troy's and Melissa's proportionate federal withholding gleaned from their W-2s.[6] Prior to that demand, Morris became aware that Melissa had also filed a chapter 7 case and that Linda Parks was her trustee. Morris and Parks corresponded about how

---

[1] The divorce was completed upon entry of the Journal Entry of Judgment and Decree of Divorce on November 9, 2005. *See* Ex. A. This journal entry was entered as an uncontested divorce and by agreement of the parties.

[2] Ex. A, p. 11, ¶ 16.

[3] In the divorce case Wright was represented by Keith Martin, a lawyer in the same firm as Shay, Wright's bankruptcy counsel. It is apparent to the Court that there was little or no communication between Messrs. Shay and Martin regarding the simultaneously pending bankruptcy and divorce cases.

[4] Ex. 2.

[5] Ex. 6. The federal and state tax refunds totaled $7,572.

[6] Ex. 5. *See In re Kleinfeldt*, 287 B.R. 291 (10th Cir. BAP 2002).

-3-

to divide the refunds between the two estates, Morris suggesting that his estate receive the $6,691 based on respective withholding of the parties and Parks suggesting that her estate receive $1,882 based on the respective pay of the parties.[7]

On May 26, Morris filed his motion for turnover, requesting Wright to turnover $6,691.51 of the 2004 tax refunds.[8] Morris submitted this motion on "negative notice," a practice in this Court which provides that only if the debtor files a timely objection will the matter be called on the Court's miscellaneous motions docket. The objection deadline of June 15 passed without any objection from Wright. On June 16, after the deadline had passed, Shay wrote Morris and advised him that Parks had demanded 50 per cent of the refund for her estate and requested direction from Morris. On June 21 Morris presented, and the Court signed, an order granting the turnover motion and ordering turnover of the $6,991.51 within ten days.[9] Morris testified that he doubted that he or his counsel, Sarah Newell, ever had any conversation or other contact with Shay before submitting the order. Nor could Morris state whether he had seen Shay's June 16 letter when he submitted the turnover order. This first turnover order was not appealed and is final.

On June 28, Ms. Newell corresponded with Shay, again demanding turnover of the $6,691.51 and advising that the trustee was unaware of any proposition by Parks that the refund be divided evenly among the estates. After a further letter from Newell, Shay finally forwarded a check in

---

[7] Ex. 7 and 8.

[8] Ex. 9.

[9] Ex. 11. Under D. Kan. LBR 9004.1(b)(3) when no objection is filed, the movant is to submit an order to the Court within ten (10) days of the objection deadline.

-4-

August for $3,345.76, representing one-half of $6,691.51 (not $7,752).[10]

On November 9, 2005, the Sedgwick County District Court entered judgment in the Wrights' divorce case, purporting to divide the income tax refund equally between the ex-spouses. The Journal Entry of Judgment and Decree of Divorce was entered by agreement of the parties and was entered as an uncontested divorce without a formal hearing.[11] Wright admitted at trial that he knew prior to the divorce decree that the trustee was seeking more than one-half of the 2004 refund. He also conceded that he knew the Court had ordered him to turnover $6,691. Wright also testified that his divorce attorney knew he was in bankruptcy and of the trustee's demand for the 2004 tax refund.

At the end of 2005, Morris corresponded with Shay and Wright, this time requesting copies of Wright's 2005 individual tax return and a small portion of Wright's 2005 refund ($270.28), representing the fourteen days in January of 2005 before Wright filed his case. By May of 2006, Morris had yet to receive a response and, on May 3, he restated his demand and threatened to file a motion to compel regarding the 2005 refund. On May 31, Shay provided the returns, but no money. On July 11, 2006, Morris filed another motion for turnover to recover the $270 refund plus a $200 sanction. No objections were filed and this Court entered an order granting that turnover motion on August 15. This second turnover order is also final.

When Wright failed to comply with that order, Morris filed this adversary proceeding for turnover under § 542 and to revoke Wright's discharge under 11 U.S.C. § 727(d)(2) (failure to surrender estate property) and § 727(d)(3) and § 727(a)(6)(A) (refusal to obey a lawful court

---

[10] Ex. 14. In that transmittal letter, Shay admitted that Wright had received one-half of the total refunds, or $3,876.

[11] Ex. 24.

-5-

order).[12]  Morris also sued Parks to determine the Melissa Wright estate's interest in the 2004 refunds.  At trial, Morris announced that he had settled with Parks on the eve of trial.  Morris seeks turnover of $3,345.75, the remaining one-half of the $6,691.51 2004 refunds, and $470.28, the estate's share of Wright's 2005 refund and sanctions entered by the Court.

Wright argued at trial that he did not *intentionally* disobey the Court's turnover orders.  His bankruptcy counsel could not explain to the Court why no objection to the trustee's motion for turnover was filed.  His counsel also conceded that the division of property by the divorce court violated the automatic stay, but insists that Wright should not be penalized for this violation.  Wright's bankruptcy counsel offered no explanation why his law partner pursued the division of property in the divorce case while the bankruptcy stay was in force and *after* the first turnover order had been entered.  Nor does Wright make any contention that he was unable to comply with the turnover orders.

**<u>Analysis</u>**

This case is a cautionary tale for every lawyer (and client) filing a bankruptcy in close proximity to a divorce case.  Failure to recognize the impact of either case on the other can result in exposure to double recovery, if not more grave consequences.  It also reveals the potential danger of having a different attorney representing the debtor in his bankruptcy case and divorce case.  This case also presents the too-frequent scenario of a trustee being required to take a series of legal actions to recover estate property in the hands of a debtor when the turnover of that property is an

---

[12] The bankruptcy case in which this adversary proceeding is filed was commenced prior to October 17, 2005, the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. §101, et seq. as it was in force prior to that date.

affirmative duty of the debtor, not an optional act. Here, the trustee has pursued the debtor's tax refunds for a period of two years.

**Divorce and Bankruptcy: Marital Estate v. Bankruptcy Estate**

When a Kansas divorce case is filed, a marital estate is created pursuant to KAN. STAT. ANN. § 23-201(b) (2006 Supp.). That estate consists of all the property individually or jointly held by each spouse and includes all property acquired by the spouses during their marriage.[13] At the moment of filing for divorce, each spouse becomes the owner of a vested, but undetermined interest in all the property in the marital estate, pending the domestic court's division of the same.[14] KAN. STAT. ANN. §60-1610(b)(1) (2005) grants to a Kansas district judge the power to determine the extent of that interest and divide "as justice and equity" require, the property in the marital estate between the two spouses as a part of the final decree.[15]

When a divorcing spouse files a bankruptcy petition, a bankruptcy estate is created by operation of 11 U.S.C. § 541(a). That estate generally includes all legal or equitable interests of the debtor in property, wherever located and by whomever held, as of the date of the bankruptcy petition. In this case, when Troy Wright filed his bankruptcy petition here, his bankruptcy estate

---

[13] *In re Gabel*, 353 B.R. 295, 298 (Bankr. D. Kan. 2006)

[14] KAN. STAT. ANN. § 23-201 describes this vested interest as a "common ownership in marital property." *See Cady v. Cady*, 224 Kan. 339, 344, 581 P.2d 358 (1978) (describing a spouse's interest in marital property as a species of common or co-ownership); *In re Gabel, supra* (each party to the marriage holds a "common ownership" in the marital property).

[15] *See In re Marriage of Roth,* 28 Kan. App. 2d 45, 48-49, 11 P.3d 514 (2000) (The division of all the property in the marital estate must be just and reasonable, but not necessarily an equal division.)

-7-

included his vested, but undetermined, interest in his and Melissa's marital property.[16]  The bankruptcy code protects the property of the estate by imposing a stay of all actions against either the debtor or the property of estate under § 362(a)(1) (as to the debtor) and § 362(a)(3) and (4) (as to the property of the estate).[17]  This broad protection is designed to place all creditors on a level playing field as they vie for their share of the distressed debtor's assets.  It also serves to allow the bankruptcy trustee an interval in which to determine what he has to administer and how to secure it.  The stay has an effect like that of an injunction: the listed actions are proscribed on pain of contempt and other sanctions.[18]  Perhaps more relevant in this case, actions taken against the debtor's property in violation of the automatic stay are void and of no effect.[19]

The impact of these rules on this case is simple but profound.  When the Wrights' divorce case was filed in July of 2004, the marital estate was created.  When Troy Wright filed his bankruptcy petition, all of his property, including his yet undetermined interest in the Wrights'

---

[16] *See In re Vann*, 113 B.R. 704 (Bankr. D. Colo. 1990) (Bankruptcy court would give no effect to debtor's and spouse's understanding as to which property would be his and which property would be hers in determining whether property was included in bankruptcy estate where debtor and spouse had filed petition for legal separation but divorce proceeding had not been commenced and spouse's inchoate interest in marital property had not been determined.); *In re Polliard*, 152 B.R. 51 (Bankr. W.D. Pa. 1993) (Non-debtor spouse's interest in debtor's share of marital property that is the subject of pre-bankruptcy divorce action are cut off by bankruptcy filing if division of property has not been finalized).

[17] *See In re Gardner*, 913 F.2d 1515 (10th Cir. 1990) (After stay relief was obtained and divorce court awarded marital property to debtor's former spouse, marital property was no longer property of the bankruptcy estate and bankruptcy court lacked jurisdiction to determine dispute regarding the property between former spouse and federal government under tax lien.).

[18] *See also* 11 U.S.C. § 362(h) (Thomson/West 2005) (permitting recovery of damages, attorney fees and punitive damages for a willful violation of the stay)

[19] *See Ellis v. Consolidated Diesel Elec. Corp.*, 894 F.2d 371 (10th Cir. 1990); *In re Calder*, 907 F.2d 953 (10th Cir. 1990); *In re Thomas*, 362 B.R. 478 (10th Cir. BAP 2007).

marital assets, became a part of his bankruptcy estate. Further proceedings under KAN. STAT. ANN. § 60-1610 to determine the extent of his property interests in the marital estate were automatically stayed by operation of 11 U.S.C. § 362(a) upon the filing of his bankruptcy in January of 2005. Neither of the Wrights sought or obtained relief from the stay to proceed with the divorce property division. Therefore, the November 2005 divorce decree, which memorialized the settlement agreement of the Wrights, is void and of no effect, at least with respect to the purported division of the tax refund.

### **The Debtor's Duty to Turnover**

Section 521(4) and section 542(a) requires a debtor to turnover his property to the trustee for administration unless that property is exempt.[20] A tax refund attributable to the prepetition portion of the tax year in which the debtor filed for relief becomes property of the debtor's estate and is subject to turnover to the trustee.[21] Therefore, where the property is the subject matter of a pending divorce proceeding, the trustee is entitled to possession of it even though that possession may be subject to whatever lien or charge exists against the property by virtue of KAN. STAT.. ANN. § 23-201(b). It is the duty of every debtor to turn that property over immediately upon filing, or, in the case of a tax refund, upon coming into possession of the funds. Bankruptcy Code sections 521, 541 and 542 make that abundantly clear. It is no excuse that the funds are subject to division by another court, unless and until the parties claiming an interest in the funds, other than the trustee, seek relief from the stay in this Court to proceed to effectuate the property division in the domestic court. This

---

[20] *In re Muniz*, 320 B.R. 697 (Bankr. D. Colo. 2007) (obligation to turnover tax refund); *In re Beach*, 281 B.R. 917 (10th Cir. BAP 2002) (debtor's duty to turnover tax returns).

[21] *See In re Barowsky*, 946 F.2d 1516 (10th Cir. 1991).

Court will nearly always defer to the domestic court for that purpose.

Section 521, as it existed prior to October 17, 2005, provided for the debtor to file a list of creditors, schedules of debt and property, and a statement of the debtor's financial affairs. Wright's schedules do not disclose an expectancy of an income tax refund. His statement of financial affairs, at Question 4, does not disclose the pending divorce between himself and Melissa, even though he was represented in the divorce case by Mr. Shay's law partner. Only in the course of conducting the § 341 examination of debtor did the trustee learn of the availability of the refund and pending divorce case. As noted above, § 541 defines the extent of the property of the estate. "All legal and equitable interests of the debtor" certainly embraces a tax refund for the year prior to the debtor's petition date. Section 542(a) requires "any entity in possession, custody or control, during the case, of property" of the estate to turn it over and account for the property. This is an affirmative duty imposed upon debtors and is a duty that must be fulfilled to obtain the benefit of a discharge.[22] The need for a court's intervention to compel that turnover should be the exception and not the rule. Here, the Court has had to twice intervene by entering uncontested turnover orders against this debtor concerning his 2004 and 2005 refunds. The trustee has had to commence an adversary complaint and bring it to trial. Only on the day of trial did Wright agree to comply with the second turnover order pertaining to the 2005 refund. He has still failed to comply fully with the first turnover order.

**<u>Revocation of Discharge for Turnover Failure</u>**

This court has few more powerful remedies at its disposal than those provided in § 727(d). That section allows a court to revoke a debtor's discharge when the trustee demonstrates that the

---

[22] *In re Beach, supra* at 921; *In re Muniz, supra* at 699.

-10-

debtor has refused to obey a court order and acquired, but failed to account for property of the estate. As the bankruptcy court in *In re Muniz* noted:

> Those persons who seek the extraordinary relief of a bankruptcy discharge may not ignore their legal obligations to the court and the trustee and still expect to receive a discharge of debt.[23]

The trustee has the burden of proving his revocation of discharge claim by a preponderance of the evidence.[24]

### Section 727(d)(3)

Section 727(d)(3) incorporates by reference § 727(a)(6)(A) which provides that a debtor may not be granted a discharge if he has refused to obey a lawful order of the court. Some controversy has arisen in the cases concerning what showing is necessary to establish a "refusal" to obey a court order and revoke a debtor's discharge. Some courts have applied a standard similar to that required to hold a party in civil contempt.[25] Other courts have required a showing that debtor willfully or intentionally disobeyed the turnover order.[26] A debtor's inability to comply with the order,

---

[23] 320 B.R. 697, 699 (Bankr. D. Colo. 2005). *See also, In re Meyers*, 293 B.R. 417 (Bankr. N.D. Ohio 2002) (A debtor who refuses to obey a lawful order of the court must be denied a discharge in bankruptcy in order to protect the integrity of the bankruptcy process); *In re Reese*, 203 B.R. 425, 431 (Bankr. N.D. Ill. 1997) ("A debtor seeking the benefit of a discharge pays a price. That price is the performance of certain duties, such as cooperation with the Trustee.").

[24] *Bowman v. Belt Valley Bank (In re Bowman)*, 173 B.R. 922, 925 (9th Cir. BAP 1994).

[25] *Hazlett v. Gorshe (In re Gorshe)*, 269 B.R. 744 (Bankr. S.D. Ohio 2001) (A showing that debtor had knowledge of the order, that debtor violated the order, and that the order was specific and definite in its terms.).

[26] *See e.g., Gillman v. Green (In re Green)*, 335 B.R. 181 (Bankr. D. Utah 2005); *Marcus v. Jeffries (In re Jeffries)*, 356 B.R. 661 (Bankr. E.D. Va. 2006); *LaBarge v. Ireland (In re Ireland)*, 325 B.R. 836 (Bankr. E.D. Mo. 2005). These courts typically examine a debtor's conduct to infer the necessary intent or willfulness.

inadvertence, mistake, or impossibility will ordinarily be insufficient to revoke a debtor's discharge.

This Court concludes that under either standard, Wright "refused" to obey this Court's two turnover orders within the meaning of § 727(a)(6)(A). Each of the turnover orders was lawfully entered. It is very telling that in this case, debtor's bankruptcy counsel did not file a response to either of the trustee's turnover motions and legitimately contest the turnover. There is no question that debtor and his counsel received the two turnover orders and their clarity is unmistakable. Nor did debtor testify that he was unable to turnover the refunds because he had spent the funds on necessities and was financially unable to repay the funds.

With respect to the second turnover order regarding the 2005 refund, Wright proffered no excuse or justification for not surrendering the estate's share of the 2005 refund. Only on the day of trial, after the trustee obtained a turnover order and commenced this revocation proceeding, did debtor indicate he would comply with the turnover order. Debtor did not contend that he was unaware of the second turnover order, that he was unable to comply with the second turnover order, or that he never received the 2005 refund. To repeat, in a case like this, *no trustee should be required to bring a turnover motion followed by an adversary proceeding to recover a $270 tax refund.* A simple turnover letter should suffice and only if the debtor has some justiciable basis upon which to object should there be court involvement of any kind. The Court concludes that Wright refused to obey the second turnover order and that such refusal was intentional.

With respect to the first turnover order regarding the 2004 refund, the debtor contends that he did not intentionally refuse to obey the turnover order. Wright seems to suggest that by paying one-half of what the Court ordered (after repeated demands by the trustee), he has not refused to obey the turnover order. Wright asserts in defense the divorce decree subsequently obtained in state

-12-

court. As the Court noted previously, Wright obtained the divorce decree (with the conflicting division of the tax refund) without first obtaining relief from stay from this Court. The divorce decree is therefore void and offers no protection from the turnover order. In the Court's view, Wright's obtaining the conflicting divorce decree evidences his intentional and willful disregard for the turnover order. While the Court can appreciate how the debtor could have been confused by the seeming conflict between his bankruptcy case and the divorce case, he had the benefit of counsel in both cases. It is especially troubling to the Court that Wright proceeded in open defiance of the turnover order. The turnover order was entered June 21, 2005 nearly five months prior to the property division made by the divorce court in November. This temporal sequence suggests to the Court that Wright and his counsel openly disregarded the turnover order in violation of the stay and in an effort to obtain a more favorable outcome from the divorce court.

Other conduct of Wright and his counsel further supports a finding that the turnover order was intentionally disobeyed. When Wright did pay the trustee, he paid one-half of the 2004 refund allocated to him ($3,345.76 of the $6,691.51), not the amount of the refund Wright had received ($3,876), thus shorting the trustee of $530 in a best case scenario. At the time of this payment, Wright did not attempt to obtain a repayment plan from the trustee for the balance of the $6,691.51 the Court ordered turned over. Wright in effect opted to follow the divorce decree and expressed no intention of complying with the turnover order.

The Court is firmly persuaded that the debtor intentionally refused to obey both of its turnover orders concerning the tax refunds and that, if immediate remedial action is not taken, his discharge should be revoked under § 727(d)(3).

**Section 727(d)(2)**

The trustee also seeks to revoke Wright's discharge on the basis of § 727(d)(2). That subsection provides for revocation upon a showing that the debtor acquired estate property and knowingly and fraudulently failed to deliver or surrender it to the trustee. To revoke Wright's discharge under this subsection, the Court must be convinced of his fraudulent intent. The numerous inconsistencies in debtor's schedules, statement of financial affairs, and actual statements to the trustee at the § 341 are disturbing. While these inconsistencies do not necessarily reflect a calculated intent to deceive or defraud, they do betray a disregard by debtor or his counsel of the debtor's duties to fully disclose what he had and to be completely candid with the Court and trustee. The evidence shows that Wright did not understand the process and understandably relied on his counsel. Notwithstanding the early and repeated admonitions and demands by the trustee regarding the 2004 tax refunds, Wright acted on the belief that what he and his ex-wife verbally agreed to concerning the 2004 refund controlled what the trustee was entitled to receive. While that belief was misguided and ill-advised, the Court is not convinced that Wright acted with fraudulent intent. Judgment should be entered in favor of Wright on the trustee's revocation claim under § 727(d)(2).

**Conclusion**

Judgment should be entered on the trustee's complaint against defendant Troy Wright in the amount of $6,691.51 in connection with the 2004 refund and $270.28 in connection with the 2005 refund. The debtor is entitled to a credit of $3,345.76 received by the trustee on the 2004 refund. Judgment shall also be entered against the defendant Troy Wright in the amount of $200, representing the sanctions previously ordered by this court in the turnover orders. The defendant is ordered to turn these funds over forthwith. If these money judgments, after appropriate credits, are not paid in full within sixty (60) days of the entry of judgment, the trustee may present a further

journal entry revoking debtor's discharge pursuant to § 727(d)(3) and § 727(a)(6)(A) and directing the Clerk to notify all of his creditors and parties in interest of same.

A Judgment on Decision will issue this day.

# # #

-15-